**GASTON & ASSOCIATES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–910C.**

United States Court of Federal Claims.

Dec. 3, 1992.

---

D.K. "Kirby" Wright, Jr., Seattle, Wash., for plaintiff.

Jeri Kaylene Somers, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, and Martha H. DeGraff, for defendant. Phillip Santerre, U.S. Army Corps of Engineers, of counsel.

## MODIFIED ORDER

MOODY R. TIDWELL, III, Judge.

This case is before the court on defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment. For the reasons set forth below, the court grants plaintiff's motion and denies defendant's motion.

## FACTS

On February 15, 1989, the United States Army Corps of Engineers ("the Corps") issued an invitation for bids for the construction of three Battalion Headquarters Buildings at Fort Wainwright, Alaska. Work included the construction of two new one-story 14,840 square foot concrete ma-

sonry buildings and the alteration of an existing 2,577 square foot building with construction of a 5,140 square foot concrete masonry addition to the building. The three buildings were at different locations on Fort Wainwright. The Invitation for Bids ("IFB") permitted the Corps to award the individual building projects to different bidders, or to award all three projects to a single bidder.

On March 28, 1989, the Corps held its bid opening for this contract, and on April 17, 1989, awarded the entire fixed-price construction contract to Gaston & Associates, Inc. ("Gaston") for a total price of $5,793,-000.00. The Corps gave its notice to proceed on April 28, 1989, acknowledged May 1, 1989. Also on May 1, 1989, Gaston submitted a network analysis system and bar chart which displayed concurrent construction of all three buildings.

The parties' dispute centers on the interpretation of two contract clauses addressing the Contractor Quality Control ("CQC") System. Gaston based its bid on the project on its plans to designate the project superintendent as the CQC System Manager. Gaston also planned to have one CQC inspector monitor the entire project, i.e. construction of all three buildings. Gaston submitted its Quality Control Plan ("the Plan") to the Corps on May 10, 1989. The Plan named John Ballard as CQC System Manager and project superintendent, and named Russell Lowney as the sole CQC staff person, i.e. the sole quality control inspector.

The Corps orally rejected the Plan on May 15, 1989, stating that the project superintendent could not act as the CQC System Manager, and that a full-time CQC inspector would be required for each of the three buildings. After revisions and discussions about the staffing of the CQC System, Gaston submitted a revised Quali-

ty Control Plan assigning the project superintendent and CQC System Manager positions to two individuals, and designating three CQC inspectors. On August 7, 1989, the Corps accepted this Plan, submitted on July 6, 1989.

On August 21, 1989, Gaston filed a Request for Contracting Officer's decision on its claim for an equitable adjustment of $147,958.00, the cost incurred in hiring the three additional CQC personnel not contemplated at the time of the project bid.[1] The Contracting Officer issued a decision denying the claim on April 11, 1990. Subsequently, Gaston filed suit in the United States Claims Court[2] on February 12, 1991, seeking review of the Contracting Officer's final decision.

## DISCUSSION

This case is before the court on defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment. Summary judgment is properly granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987) (citing *Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147, 149 (Fed.Cir. 1986)). In considering a motion for summary judgment, the evidence must be viewed, and inferences drawn, in a light most favorable to the non-moving party. *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146 (Fed.Cir.1983).

### I. CQC System Manager Claim

■ The dispute in this case involves issues of contract interpretation arising

---

1. The court notes that this figure exceeds the amount prayed for in plaintiff's complaint by $90.00. The figure $147,868.00 accurately represents the sum of the two claims made to the Contracting Officer. The court also notes that these are estimated costs, as indicated by the copy of plaintiff's Request for Contracting Officer's decision submitted with defendant's motion for summary judgment.

2. The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992), enacted on October 29, 1992, altered the name of the United States Claims Court to the United States Court of Federal Claims. The United States Court of Federal Claims is the successor to the United States Claims Court in all respects.

from two contractor quality control organization requirements contained in the contract. Interpretation of a contract is a question of law. *American Satellite Co. v. United States,* 20 Cl.Ct. 710, 713 (1990) (citing *Tilley Constructors & Engineers, Inc. v. United States,* 15 Cl.Ct. 559, [563] (1988)). The first issue pertains to Clause SC–30(4)(a), entitled "CQC System Manager," which sets forth the requirements for the contractor's quality control manager, as follows:

> The Contractor shall identify an individual, within his organization at the site of the work, who shall be responsible for overall management of CQC and have the authority to act in all CQC matters for the Contractor. This CQC System Manager shall be acceptable to the CO [the Contracting Officer] or COR.

At the time it bid on the Battalion Headquarters project, Gaston interpreted this clause to mean that the individual so named as the CQC System Manager could perform other duties on the project as well. Gaston intended to have its project superintendent simultaneously fulfill the function of CQC System Manager. Only after the Corps rejected this plan did Gaston hire another individual to act solely as the CQC System Manager.[3]

Clause 58 of the contract, FAR 52.236–6, sets forth the requirements of contractor superintendence as follows:

> At all times during performance of this contract and until the work is completed and accepted, the Contractor shall directly superintend the work or assign and have on the work [site] a competent superintendent who is satisfactory to the

Contracting Officer and has authority to act for the Contractor.

This clause makes clear that Gaston was to have someone supervising the entire Battalion Headquarters project. Read along with SC–30(4)(a), it suggests that the two sets of duties are to be held by two separate individuals, as defendant contends. However, nothing in these clauses, nor in any other clause presented to the court, prohibits the CQC System Manager from simultaneously functioning as the project superintendent.[4] Moreover, neither party has submitted credible evidence establishing prevailing industry practice as to the CQC System Manager's simultaneous performance of additional duties.

Plaintiff has submitted excerpts from the Corps' Guide Specifications which show that the Corps is capable of writing a clear and unambiguous contractor quality control organization clause. Specifically, the Guide states:

> 3.4.2.2 CQC System Manager
>
> \* \* \* \* \* \*
>
> Note: Insert desired requirements. Select appropriate options. The specifier must evaluate the project to determine the level of CQC required and select options accordingly.
>
> \* \* \* \* \* \*
>
> ...
>
> The CQC system manager shall be [assigned no other duties] [assigned as system manager but may have duties as project superintendent in addition to quality control.]

---

**3.** Defendant asserts that because plaintiff did not object to the Corps' rejection of its Plan and the requirement to hire two separate individuals to perform these jobs, it is deemed to have acquiesced in the Corps' interpretation of SC–30(4)(a) and is thus bound by it. The court does not agree. First, there is some factual dispute as to whether or not plaintiff objected to this requirement prior to submitting its claim to the Contracting Officer, and when, if ever, this objection took place. Second, and more importantly, a contractor need not object at each stage of the contract performance in order to preserve its claim for damages. Written presenta-

tion of its claim to the Contracting Officer is sufficient. 41 U.S.C. § 605(a) (1992); *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987).

**4.** The Court does not reach the question of whether the CQC System Manager may perform any *other duties* aside from those of the project superintendent as the Contracting Officer did not issue a final ruling on that issue. *See* 41 U.S.C. § 605(a); *see also Cubic Corp. v. United States,* 20 Cl.Ct. 610, 616–17 (1990).

Guide Specification, Section 01440, at 5 (Jan. 1991). And, in another version of the Guide Specification, the Guide states:

\* \* \* \* \* \*

Note: Use second option in next paragraph for complex projects where CQC system manager shall be a full time manager with no other duties.

\* \* \* \* \* \*

3.4.2.2 CQC System Manager

. . .

The CQC system manager shall be [assigned as system manager but may have duties as project superintendent in addition to quality control] [assigned no other duties].

Guide Specification, Section 01440, at 4. As the Corps chose neither option when drafting its IFB, it cannot claim that the policy on simultaneous performance of duties was explicitly set out.

■ The court finds that although SC–30(4)(a) could have been clearer its language does not give rise to a patent ambiguity, as defendant argues. *See, e.g., Monarch Painting Corp. v. United States,* 16 Cl.Ct. 280 (1989), where an ambiguity in a painting contract as to trim work and method of payment did rise to level of patent ambiguity; *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647 (1982), where a discrepancy between the specifications and drawings created a patent ambiguity. Therefore, plaintiff was under no duty to inquire about the meaning of SC–30(4)(a) before submitting its bid, as defendant contends. *See Newsom,* 676 F.2d at 650. Nevertheless, the court is mindful of the policies behind this duty. *See id.* (citing *S.O.G. of Arkansas v. United States,* 212 Ct.Cl. 125, 546 F.2d 367, 370–71 (1976); *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963)).

■ According to the two-step test articulated in *Mountain Home Contractors v. United States,* only if a court finds that a patent ambiguity is not present does the court then inquire into the reasonableness of the contract interpretation. *Mountain Home Contractors v. United States,* 192 Ct.Cl. 16, 425 F.2d 1260, 1263 (1970). As

the court finds that no patent ambiguity existed here, it now considers whether or not plaintiff's interpretation was reasonable. The court must apply the "zone of reasonableness" test, *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874, 877 (1963), and utilize the perspective that the "reasonably intelligent contractor" would employ in the same situation. *Zinger Constr. Co. v. United States,* 807 F.2d 979, 981 (Fed.Cir.1986).

The court finds plaintiff's interpretation of SC–30(4)(a) to have been reasonable. To the extent that SC–30(4)(a) was ambiguous, it was latently ambiguous. It is well established by the doctrine of *contra proferentem* that latent ambiguities are to be construed against the drafter. *Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 427 F.2d 722, 726 (1970). Therefore, defendant must bear the risk of plaintiff's having interpreted the clause differently, and must compensate plaintiff accordingly.

## II. CQC Staff Claim

■ The second issue at bar pertains to Clause SC–30(4)(b), entitled "[CQC] Personnel," which sets forth the requirements for the contractor's quality control system staff, as follows:

A staff shall be maintained under the direction of the system manager to perform all QC activities. The actual strength of the staff during any specific work period may vary to cover work phase needs, shifts, and rates of placement. The personnel of this staff shall be fully qualified by experience and technical training to perform their assigned responsibilities and shall be directly hired by and work for the prime Contractor. This staff shall consist of, at the minimum, one full time person who will be at the job site at all times construction is in progress, and whose sole responsibility shall be quality control compliance with the contract plans and specifications, for each building. This person shall have at least a high school education ... The staff shall also include additional quality control personnel as required by the Technical Specifications and as otherwise

necessary in order to fully implement the Contractor quality control system as specified.

At the time it bid on the Battalion Headquarters project, Gaston interpreted this clause to mean that a minimum of one CQC staff person in addition to the CQC System Manager was required to ensure quality control over the entire project. Gaston intended to have Russell Lowney perform the duties required by SC–30(4)(b). It was only after the Corps rejected this plan that Gaston hired two other CQC inspectors to perform these duties.

The center of the dispute in SC–30(4)(b) is over the interpretation of the following sentence: "This staff shall consist of, at the minimum, one full time person who will be at the job site at all times construction is in progress, and whose sole responsibility shall be quality control compliance with the contract plans and specifications, for each building." The precise question is how the term "job site" is construed: does it mean the entire Battalion Headquarters project, as plaintiff contends, or is each of the three buildings composing the project its own separate job site? Defendant urges that the latter meaning is the only reasonable one.

In support of this contention, defendant offers two arguments: first, that the Corps intended that each building be considered a distinct job site, as is allegedly evidenced by the August 15, 1988, Design Review Comments ("the Comments"). The Comments state that, with reference to SC–30, "[a] minimum of one quality control person for each building should be required by this clause." Defendant then urges the court to believe that the phrase "for each building" was added to SC–30(4)(b) in response to the Comments, as such a phrase had not been used in a previous contract between the parties.[5] It is necessary to understand "what" the Comments are. Defendant submitted a copy of the Comments in the appendix to its motion for summary judg-

ment on a page following its letter of August 7, 1989, as if it were an attachment to the letter. It is not. The Comments were apparently in-house documentation of the review by an unknown person or persons of the solicitation written approximately a year before the Corps issued the IFB. Part of the Comments form is a column designated for indications of corrections made in response to the reviewer's comments, or for reasons behind the Corps' choice to not correct the problem. No entry was made in the Comments showing that any correction in the IFB had been made, nor as to why a correction was not made. There is no proof of a causal connection between the reviewer's comments and the addition of the phrase "for each building" into the contract. Nor were the Comments ever released to the bidders. The Corps is capable of drafting a clear contract, and plaintiff cannot be bound by defendant's unexpressed intentions. *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 301 (1988) (citing *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971); *Singer–General Precision Inc. v. United States*, 192 Ct.Cl. 435, 427 F.2d 1187, 1193 (1970)). Defendant has not met its burden of proof with regard to this contention.

 The second argument which defendant advances in support of its contention that its interpretation is the only reasonable one—or, in the alternative, that SC–30(4)(b) is patently ambiguous—is that prior to the contract award, another bidder inquired into the meaning of SC–30(4)(b). In a letter dated March 13, 1989, Strand Inc. ("Strand") requested information on SC–30(4)(b), among other clauses. Strand asked:

> Paragraph SC–30 indicates that the Quality Control Organization shall consist of a CQC System Manager and a staff under the direction of the system manager, or a minimum of 2 people. The bidding

---

5. Defendant claims that the fact that the phrase "for each building" was not in the analogous CQC organization contract clause in a previous contract between the parties put plaintiff on notice of a patent ambiguity as to which it had a

duty to inquire. The court disagrees. Plaintiff was not under a duty to compare these two contracts to discern their similarities and differences.

schedule indicates that the bid may be awarded for schedules A, B and C together or separately. If the contractor quality control organization for A, B and C. [sic] together can consist of two people, is the contractor required to have a two person organization for each A, B and C schedules separately?

Defendant submits that because another bidder inquired about the interpretation of this contract clause, the clause contained a patent ambiguity which put plaintiff on notice to seek clarification prior to submitting its bid.[6] Contract clauses are to be interpreted from the reasonable contractor standard, *Zinger Constr.*, 807 F.2d at 981, within a zone of reasonableness. *WPC Enterprises*, 323 F.2d at 877. The Abstract of Offers for the Battalion Headquarters project indicates that plaintiff and Strand were only two among seven bidders. Defendant has proffered no evidence showing that other bidders also inquired about this contract clause. The fact that only one bidder out of seven sent an inquiry does not require the court to conclude that this bidder was the reasonable one. Perhaps Strand scrutinized the IFB in greater detail than did other bidders, or in greater detail than is customary in the industry. It seems more likely that the six bidders who did not inquire into the interpretation of SC–30(4)(b) are the proper gauge of the zone of reasonableness. More importantly, the Corps did not respond to Strand's inquiry. This indicates—although the court makes no finding addressing this—that the Corps itself did not consider the clause to contain a patent ambiguity in need of correction. The court therefore finds that both of defendant's arguments advancing their contention that the Corps' interpretation was the only reasonable one, or, in the alternative, that SC–30(4)(b) contained a patent ambiguity putting plaintiff on notice to clarify, fail.

██ According to the *Mountain Home Contractors* two-step analysis, only if a court finds that a patent ambiguity is not present does the court then inquire into the reasonableness of the contract interpretation. As discussed above, the court must apply the zone of reasonableness test, and utilize the perspective that the "reasonably intelligent contractor" would employ in the same situation. The court finds plaintiff's interpretation of SC–30(4)(b) to have been reasonable.[7] To the extent that SC–30(4)(b) was ambiguous, it was latently ambiguous. As discussed above, latent ambiguities are to be construed against the drafter. *Perry & Wallis*, 427 F.2d at 726. Therefore, defendant must bear the risk of plaintiff's having interpreted the clause differently, and must compensate plaintiff accordingly.

## CONCLUSION

Because there are no genuine issues of material fact, and upon consideration of the facts in the light most favorable to the nonmovant, the court grants plaintiff's cross-motion for partial summary judgment and denies defendant's motion for summary judgment.

The parties are hereby ordered to confer on the issue of quantum of damages and on the need for subsequent proceedings. The court will initiate a status conference two

---

6. The duty to inquire is triggered whenever a party knows or should know of a patent ambiguity, regardless of the party's actual knowledge. *Chris Berg, Inc. v. United States*, 197 Ct. Cl. 503, 455 F.2d 1037, 1045 (1972). However, it is only those patent ambiguities which are glaring which trigger the duty. *S.O.G. of Arkansas*, 546 F.2d at 370. There is no evidence in this case showing that plaintiff knew of Strand's inquiry.

7. In support of the reasonableness of its interpretation, plaintiff advances the argument that if defendant's interpretation that each building constitutes a separate job site were the only reasonable interpretation, then, reading SC–30(4)(b) along with SC–30(4)(a), the Corps would have also required one CQC System Manager per building. That is, the Corps does not claim that the phrase "[t]he Contractor shall identify an individual, within his organization at the site of the work" means that there shall be one CQC System Manager for each building. As defendant itself argues, contract clauses cannot be interpreted in isolation, but should be read with the object of finding unity and harmony between them. *See Unicon Management Corp. v. United States*, 179 Ct.Cl. 534, 375 F.2d 804, 806 (1967).

weeks after the filing of this order to discuss the results of the parties' discussions.

IT IS SO ORDERED.